The **STATE OF NEW HAMPSHIRE**, Petitioner,

v.

**ATOMIC ENERGY COMMISSION** and **United States of America, Vermont Yankee Nuclear Power Corporation, Intervenor.**

**No. 7142.**

United States Court of Appeals First Circuit.

Heard Dec. 3, 1968.

Decided Jan. 13, 1969.

---

R. Peter Shapiro, Sp. Counsel, Concord, N. H., for petitioner.

Marcus A. Rowden, Asst. General Counsel, with whom Joseph F. Hennessey, Gen. Counsel, Howard K. Shapar, Asst. Gen. Counsel, Licensing & Regulation, William C. Parler, Atty., Atomic Energy Commission, Edwin M. Zimmerman, Asst. Atty. Gen., and Seymour H. Dussman, Atty., Dept. of Justice, were on brief, for Atomic Energy Commission and others, respondents.

Warren F. Farr, John A. Ritsher, and Ropes & Gray, Boston, Mass., on brief, for Vermont Yankee Nuclear Power Corp., intervenor.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

COFFIN, *Circuit Judge.*

The state of New Hampshire seeks review of an order of the Atomic Energy Commission (AEC), granting a provisional construction permit to the Vermont Yankee Nuclear Power Corporation, organized by ten New England utility companies (applicant), to build a nuclear power reactor at Vernon, Vermont, a site on the Connecticut River, bordering New Hampshire. The permit was issued at the conclusion of a reactor licensing proceeding held under the authority of the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011 et seq.

The narrow but important issue is whether the Commission erred in refusing to consider, as outside its regulatory jurisdiction, evidence of possible thermal pollution of the Connecticut River as a result of the discharge of cooling water by applicant's facility. The proposed installation, a "boiling water" reactor, differs from a conventional electric power plant in that the turbine generators which produce the electrical energy are driven by steam derived from the heating of water by the fissioning of uranium in the reactor core. "Thermal pollution" is used to designate the effects on a river—its water, flora and fauna—of the injection of heated water.

Applicant's application, filed on December 2, 1966, was subjected to review

by the Commission's staff, in the course of which eight amendments were added, and by the Advisory Committee on Reactor Safeguards. At the subsequent public hearings before an atomic safety and licensing board, the states of New Hampshire, Vermont, and Massachusetts were granted leave to intervene. All three states sought to introduce evidence intended to show that operation of the facility without a cooling tower system for reducing the temperature of water discharged into the river would harm the natural resources of the river.[1] The board ruled such evidence inadmissible on the grounds that it related to matters beyond the Commission's jurisdiction, was proscribed by the Commission's Rules of Practice, and was not directed to the issues noticed for hearing.

The hearing occupied four days, August 1 and 2, and September 6 and 7, 1967. On the fourth day, applicant noted during the hearing for the first time that it would expand the proposed facility to include cooling towers in its open cycle system. It thereafter made three subsequent written submissions on this aspect of its plans. These were reviewed by the Commission's regulatory staff and the Advisory Committee on Reactor Safeguards solely for their impact on radiological health and safety and were found satisfactory. The three states contended that the supplemental evidence was incomplete and in insufficient detail, that the addition of the towers might not enable the facility to meet the newly evolving water quality standards for the river, and that more safety precautions might ultimately be required. The board concluded that, notwithstanding the possibility that some changes might later be necessary, a provisional construction permit could be issued. It issued its initial decision, finding favorably for applicant on the issues of public health and safety "within the meaning of those terms as authorized by the Commission".

New Hampshire filed exceptions to this decision, contending that the Commission had responsibility for considering the effects of thermal pollution, not only under the Atomic Energy Act of 1954, but also under the Water Quality

1. Without purporting to make a definitive summary of the extensive testimony and offers of proof as to such alleged harm, we note the following general thrust of the rejected evidence.

The states of Vermont, New Hampshire, Massachusetts and Connecticut have agreed to a new, upgraded future use classification for the Connecticut River which would make it more suitable for bathing and recreation, provide an excellent fish and wildlife habitat, and a source of public water supply, assuming appropriate treatment. A program for encouraging Atlantic salmon and other anadromous fish is actively being considered.

The estimated temperature increases in the river, if applicant's facility were constructed without cooling towers, would have a variety of deleterious effects. The major effects were alleged to be a substantial reduction in dissolved oxygen and consequent capacity to assimilate municipally treated waste; a change in the nature of aquatic plants and bottom fauna resulting, for example, in an increase of odiferous algae; and destruction of opportunity to develop the river as a cold water fishery.

The latter conclusion was supported by proffered testimony that the presence of a zone of water of substantially higher than natural temperature would (1) serve as a thermal barrier preventing fish from reaching their spawning grounds at the river's headwaters, (2) prematurely trigger spawning, with resultant loss of fish population from inadequate terrain for depositing roe, and (3) cause, through the abrupt change in temperature, thermal shock to migrating fish, especially young smolt and fish weakened from the reproductive process. Among the kinds of fish threatened are walleye pike, small mouth bass, perch, brown and rainbow trout, shad, and Atlantic salmon.

In addition to these possible thermal effects, the discharge of algacides used in cleaning the facility's cooling system was alleged to be potentially toxic to fish, as was the transmission of increasing concentrations of radioactive matter from aquatic invertebrates through rationuclides passed on to fish through the food chain. While the latter claim would not seem to us to be necessarily irrelevant to "public health and safety", we find no suggestion in the offers of proof that human consumers of fish would be harmed.

Act of 1965, P.L. 89–234, and Executive Order 11288 (31 F.R. 9261). The Commission denied the exceptions, relying on sections of the Atomic Energy Act relating to findings, purpose, and definitions; Congressional statements and subsequent amendments; its own regulations and rules of practice and its own adjudications. It held that neither the Water Quality Act of 1965 nor Executive Order 11288 were applicable to installations which it did not own or operate.

The Commission pointed out that no licensing action on its part relieved a licensee from any obligation to comply with state authorities or the Federal Water Pollution Control Administration of the Department of the Interior which do have jurisdiction to deal with thermal effects of power plant discharges. Its own efforts, pending action on legislative proposals to enlarge the authority of the Commission and other federal agencies, are limited to forwarding recommendations relating to thermal effects received from other federal agencies to applicants and state and local authorities and encouraging cooperation by the applicant with the proper governmental agencies.

We confront a serious gap between the dangers of modern technology and the protections afforded by law as the Commission interprets it. We have the utmost sympathy with the appellant and with the sister states of Massachusetts and Vermont which took the same position before the Commission. That position was simply that adequate planning be required of the applicant *before* a construction permit is issued in order to assure all feasible protection against thermal pollution instead of waiting until heavy investment has been made, and damage has occurred or is imminent.[2] To delay the day of reckoning is to invite the unnecessary dilemma of choosing between harming natural environment, with harmful effects on even the health and well being of humans, and frustrating the needed production of power.

In a sense there is no statutory chasm. The Atomic Energy Act itself is replete with many references to "health and safety of the public".[3] But in its section on definitions, defining twenty-nine terms, 42 U.S.C. § 2014, including "common defense and security", any attempt to delimit "health" and "safety" of the public is singularly in absentia. There is therefore considerable appeal to New Hampshire's plea that we ascribe to these terms their present day plain meaning, which would not exclude all of the alleged adverse effects attributed to thermal pollution (e.g., those having to do with reducing the waste assimilative capacity of the river).

Tempting as it may be, we do not presently feel that we fulfill our function responsibly by simply referring to the dictionary. This is perhaps a more legitimate occasion than most for invoking Mr. Justice Holmes' aphorism that "A page of history is worth more than a volume of logic." New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). Or, conceding that there is a gap, an open space, between the law as interpreted by the Commission and by the Congress, and a demonstrable social interest, we may well be mindful of Mr. Justice Cardozo's admonitory gesture, "Even within the gaps, restrictions not easy to define, but felt, however impalpable they may be, by every judge and lawyer, hedge and circumscribe his action." Cardozo, The Nature of the Judicial Process, p. 114.

Here we feel a very palpable restriction in the history surrounding the problem addressed by the Congress, the subsequent Congressional confirmation

---

2. The same position has been taken by other public bodies and citizens' groups relative to the planning of other nuclear power facilities. See, e. g., National Fisherman, December, 1968, pp. 21-A, 22-A [dispute over planned discharge of cooling water from proposed facility at Turkey Point, Florida].

3. See, e. g., Sections 53(b), 63(b), 69, 81, 103(d), 104(d), 161(b), and 161(i), 42 U.S.C. §§ 2073(b), 2093(b), 2099, 2111, 2133(d), 2134(d), 2201(b), and 2201(i).

of the limited approach taken by the Commission, the contemporary efforts in the Congress to broaden that approach, and a recognition of the complexity of administrative arrangements which would attend a literal definition of public health and safety as these terms are used in the Atomic Energy Act.

The history of the 1954 legislation reveals that the Congress, in thinking of the public's health and safety, had in mind only the special hazards of radioactivity.[4] Moreover, we note the very special relationship, crystallized in statutory form between the Commission and the Joint Committee on Atomic Energy—a relationship that is rarely embodied in positive law. 42 U.S.C. § 2252.[5] The Joint Committee, in its first study report, made its focus clear when it said, "The special problem of safety in the atomic field is the consequence of the hazards, created by potentially harmful radiations attendant upon atomic energy operations." Joint Committee Print, A Study of Atomic Energy Commission Procedures and Organization in the Licensing of Reactor Facilities, 85th Cong., 1st Sess., p. 4 (1957).

The Commission has been consistent in confining itself to these hazards. Its regulations as to licensing and standards have specified the objective as eliminating radiological danger. 10 C.F.R. Parts 20, 70, 100. Its adjudications have been bottomed on a similar concern. See, e. g., Matter of Consolidated Edison Company, Nov. 24, 1965 (3 AEC

---

4. The Senate and House Reports, in contrasting conditions in 1954 with those when the Atomic Energy Act of 1946 became law, said, "Moreover, there was little experience concerning the health hazards involved in operating atomic plants, and this fact was in itself a compelling argument for making the manufacture and use of atomic materials a Government monopoly. * * * It is now evident that greater private participation in power development need not bring with it attendant hazards to the health and safety of the American people." Senate Report No. 1699, Vol. I, Legislative History of the Atomic Energy Act of 1954, p. 751; House Report No. 2181, id., p. 999, U.S.Code Congressional and Administrative News, p. 3458.

Very little else on the subject of health and safety can be found in the massive three volume Legislative History; only four unilluminating references to these words are contained in the index. It seems obvious to us that these terms were beyond the purview of the 1954 deliberations and that their meaning had been deemed settled at the time of passage of the Atomic Energy Act of 1946.

In the Senate Report accompanying this earlier legislation, the establishment of an absolute government monopoly of production of fissionable material was in part justified by the observation that such production "is attended by serious hazards to public health and safety. The responsibility for minimizing these hazards is clearly a governmental function." Sen. Rep. No. 1211, U.S.Code Cong.Service, 79th Cong., 2d Sess., 1946, p. 1330. More clearly, in commenting on § 12 of the Act, granting various kinds of authority to the Commission, the report described one of the grants as to "Establish safety and health regulations for the possession and use of fissionable and byproduct materials to minimize the danger from explosion, radioactivity, and other harmful or toxic effects incident to the presence of such materials." Ibid., p. 1335. Section 12 of the Act was more brief, speaking of "danger from explosions and other hazards." Ibid., p. 736. We see no motive other than one of simplifying language in the deletion of "from explosions and other hazards" in the 1954 legislation.

5. Under section 2252 the Joint Committee is charged with making continuing studies of problems relating to the Commission's work, with receiving information requested from all government agencies relative to the Commission's responsibilities, and with receiving all legislative proposals concerning the control of atomic energy. It was this section on which the Supreme Court placed particular emphasis in Power Reactor Development Co. v. International Union of Electrical Workers, 367 U.S. 396, 409, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) when it said:

"It may often be shaky business to attribute significance to the inaction of Congress, but * * * considering especially the peculiar responsibility and place of the Joint Committee on Atomic Energy in the statutory scheme, we think it fair to read this history as a *de facto* acquiescence in and ratification of the Commission's licensing procedures by Congress. * * *"

62); Matter of Jersey Central Power and Light Company, May 6, 1965 (3 AEC 28). Its Rules of Practice have proscribed, as a nonjurisdictional matter, "the thermal effects (as opposed to the radiological effects) of the facility operation on the environment". 10 C.F.R. Part 2, Appendix A. III(c) (7). The Joint Committee has not, so far as we have been led to believe, disapproved of this concept of the Commission's concern.

Subsequent amendments, perfected and attempted, shed additional light on the delineation of scope intended by the Congress. In 1959 the Congress provided for the Commission's relinquishing to the states control over nuclear materials and activities. For the first time the legislation spoke in terms of "protection of the public health and safety from radiation hazards". 42 U.S.C. § 2021(b). The same statute, 42 U.S.C. § 2021(k) specified that there was no intent to restrict states or local agencies in regulating activities "for purposes other than protection against radiation hazards". In 1965, after Maun v. United States, 347 F.2d 970 (9th Cir.1965) had held that the Commission was subject to other agencies, federal, state, and local, concerning the generation, sale, and transmission of electric power, the Congress amended 42 U.S.C. § 2018 to make clear that no federal, state, or local agency had any power of control over activities of the Commission. The Joint Committee, in its report (S.Rep. No. 390, 89th Cong., 1st Sess., p. 4, 1965) said, " * * * AEC's regulatory control was limited to considerations involving the common defense and security and the protection of the health and safety of the public with respect to the special hazards associated with the operation of nuclear facilities."

While the reference to "special hazards" may not be conclusive, any doubt as to the Congressional meaning disappears when we take note of the unsuccessful prosecution of a number of bills, including some by members of the Joint Committee on Atomic Energy, which would have required the Commission to condition a license on conformance to standards relating to thermal effects. All of these proposals were postponed by the 90th Congress for further consideration. It is obvious that there is a genuine issue as to whether the Commission or the Department of the Interior should have jurisdiction to require conformance with applicable water quality standards by nuclear power facilities. See comments of the Department of Justice on H.R. 18667 and S. 3851, Hearings on Participation by Small Electrical Utilities in Nuclear Power before the Joint Committee on Atomic Energy, 90th Cong., 2d Sess., Part 2, Appendix 20, at p. 1377.

In short, we conclude that, in enacting the Atomic Energy Acts of 1946 and 1954, in overseeing its administration, and in considering amendments, the Congress has viewed the responsibility of the Commission as being confined to scrutiny of and protection against hazards from radiation.

New Hampshire has sought to bulwark its case by invoking the 1965 amendments to the Federal Water Pollution Control Act, 33 U.S.C. § 466 et seq., and Executive Order 11288, 31 F.R. 9261, which was subsequently issued in furtherance of that act as amended.

Section 466h of the act, declares the Congressional intent

"That any Federal department or agency having jurisdiction over any building, installation, or other property shall * * * cooperate with * * * any State * * * having jurisdiction over waters into which any matter is discharged from such property, in preventing or controlling the pollution of such waters."

New Hampshire argues that the Commission's power to condition, revoke, suspend and modify licenses, 42 U.S.C. §§ 2233–2238, 10 C.F.R. § 50.54, constitutes "having jurisdiction", even though the owner and operator of the facility is a private corporation.

That this language was intended to encompass only installations owned by and operated for the government, rather

than those subject to the government's regulatory powers, is made clear by the legislative history—antecedent and subsequent.[6] This proprietary interpretation of jurisdiction is reinforced by consideration of the unsuccessful attempt in the 90th Congress to broaden the coverage of § 466h to include any "federal department or agency * * * which * * * issues any lease, license, or permit * * * for any activity." This amendment, S. 3206, sponsored by Senator Muskie, passed the Senate but was not accepted by the House during the closing days of the Congress for the specific reason that there was inadequate time to consider "[t]he implications of a basic change in Government policy". (Remarks of Congressman Clark, House manager of the legislation, 114 Cong.Rec.H 10000, daily ed., October 14, 1968.)

Executive Order 11288, addressed to implementing the Federal Water Pollution Control Act, supplies no additional comfort to New Hampshire. It repeats the statutory objective of maximizing cooperation with the states, § 1(6), and states that "Water pollution control needs shall be considered in the initial stages of planning for each new installation", § 1(7). But subsequent sections 2–6 refer only to existing and new federal installations. Only section 7 goes beyond direct operations in directing agency and department heads to review loan, grant, and contract practices with a view to determining "the extent to which water pollution control standards similar to those set forth in this order

for direct Federal operations should be adhered to by borrowers, grantees, or contractors * * *." In the case before us, applicant falls into none of these classes.[7] We conclude that the licensing board and the Commission properly refused to consider the proffered evidence of thermal effects. We do so with regret that the Congress has not yet established procedures requiring timely and comprehensive consideration of non-radiological pollution effects in the planning of installations to be privately owned and operated. But the very fact that complex questions of jurisdiction among federal agencies, of federal-state relations, of procedure, and even of specialized staff and appropriations must be resolved indicates the inappropriateness of any judicial fiat—particularly when the legislative branch is actively seised of the problem.

One final issue is raised by New Hampshire's argument that the Commission's action has resulted in a taking of property—i. e., use of the Connecticut River—from the citizens of New Hampshire generally without due process and just compensation and for a private as contrasted to a public use. The Commission's response, that the provisional construction permit merely authorizes construction of a facility, that it does not authorize the use of water from the Connecticut River, and that the applicant is not relieved from any obligation to comply with applicable state and federal laws, seems a sufficient one.

Affirmed.

---

6. The conference report, explaining the language, 102 Cong.Rec. 11154, stated that it applied to "Federal agencies discharging matter into any waters." Subsequent provisions added to § 466h in 1961 referred specifically to "any discharges allegedly contributing to pollution from any Federal property" and, in the event of any hearing related to "such discharges," to the giving of notice to "The Federal agency having jurisdiction over the property."

7. New Hampshire asserts that "the nature of the permit and license agreement is

clearly contractual in nature." While the mutual undertaking in such a license agreement may be "contractual in nature," this fact does not convert a license into the type of contract for operations envisaged by the Executive Order. New Hampshire's argument that applicant will receive a federal loan or grant of nuclear material is denied, on a factual basis, by the Commission, which further observes that 42 U.S.C. § 2061 (dealing with ownership of government production facilities) is not applicable.