**GULF OIL CORPORATION et al.,**
**Plaintiff-Appellees,**

v.

**The Honorable Rogers C. B. MORTON,**
**Secretary of the Interior of the United**
**States of America, et al., Defendant-**
**Appellants.**

**No. 72-2449.**

United States Court of Appeals,
Ninth Circuit.

Nov. 27, 1973.

Rehearing Denied Mar. 25, 1974.

142

William D. Keller, U. S. Atty. and Donald J. Merriman, Asst. U. S. Atty., Los Angeles, Cal., Jacques B. Gelin (argued), Kent Frizzell, Asst. Atty. Gen., Edmund B. Clark, Myles E. Flint, Attys., U. S. Dept. of Justice, Washington, D. C., for defendant-appellants.

Gibson, Dunn & Crutcher-Samuel O. Pruitt, Jr., (argued), A. L. Wirin, and Fred Okrand (argued) for amici curiae, Los Angeles, Cal.

Marvin Levine, Deputy Co. Counsel, Santa Barbara, Cal., for plaintiff-appellees.

Before CHAMBERS and DUNIWAY, Circuit Judges, and BOLDT,* District Judge.

* The Honorable George H. Boldt, Senior United States District Judge, Western District of Washington, sitting by designation.

## OPINION

DUNIWAY, Circuit Judge:

This is an appeal by the Secretary of the Interior and subordinate federal officials from a judgment (1) setting aside the Secretary's orders suspending drilling operations on eleven oil and gas leases in the Santa Barbara Channel, (2) directing the Secretary to forthwith grant all pending applications for drilling permits, and (3) extending the initial term of these leases for 32 months to enable the lessees to exercise their rights under these leases.

We reverse.

### 1. *The Facts*

The relevant facts have been stipulated to by the parties. Plaintiffs are the holders of eleven oil and gas leases covering areas of the outer continental shelf in the Santa Barbara Channel, granted in 1968 pursuant to the terms of the Outer Continental Shelf Lands Act, 67 Stat. 462 (Aug. 7, 1953), 43 U. S.C. §§ 1331–1343 (OCS Act). They have paid some $153,000,000 for these leases. In January, 1969, a well being drilled by Union Oil Company under another lease, not one here involved, blew out, causing the massive Santa Barabara oil spill. Shortly thereafter, the Secretary suspended all operations on certain leases in the Channel. This order was complied with, although the companies took an unsuccessful administrative appeal, and the leases were extended for the period of the suspension. In April, 1971, before plaintiffs had begun drilling under the leases here in question, they were again ordered to suspend operations. They were informed that this suspension was to continue until January, 1973, that the lease terms would be extended for an appropriate period of time, and that no royalties would be due from them during the suspension. On appeal, the Secretary sustained the suspension, stating that it was for the purpose of permitting Congress to consider proposed legislation to terminate the leases, and that the action was taken "in the interest of conservation." His decision incorporated a statement by the Acting Director of the United States Geological Survey which identified three environmental risks which would be involved in continuing operations under the leases: the possibility of another blowout; the possibility that wells would be improperly plugged should the legislation pass and abandonment become necessary; the possibility that geologic structures such as the one which contributed to the 1969 spill would be encountered and fractured, thus causing large quantities of oil and gas to escape. The statement emphasized that none of these risks was acute and that, if the development and extraction of oil were contemplated under these leases, the risks would be acceptable. However, it also concluded that the risks were unacceptable in light of the fact that the leases might be terminated in the near future.

The plaintiffs then filed this action, requesting that the suspensions be declared invalid and revoked, that the Secretary be ordered to issue drilling permits for the leases, and that the leases be extended to compensate for the loss of drilling time. The district court entered judgment in their favor, stating:

"This Court considers that the only suspension orders which can be issued by the Secretary are those provided for by Section 12 of the Act [dealing with suspension during time of war and for defense purposes] or those providing for the suspension of actual operations when requested by the lessee or when necessary to prevent waste or damage to person or property." 345 F.Supp. at 685, 688–689.

### 2. *The Standard of Review*

■ It is clear that this action, one for relief in the nature of mandamus, is "review of agency action" and so subject to the Administrative Procedure Act, 5 U.S.C. § 703. The Secretary's action is what has been called "informal" agency action, i. e., administrative action which may be taken without formal hearings

or other opportunity for public participation. *See* Note, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 316 n. 10 (1971). Cf. Citizens to Preserve Overton Park v. Volpe, 1971, 401 U.S. 402, 413–417, 91 S.Ct. 814, 28 L.Ed.2d 136.

The six standards of review are established by the Administrative Procedure Act, 5 U.S.C. § 706(2):

> "The reviewing court shall—
>
> .    .    .    .    .    .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

Subsections (E) and (F) obviously have no relevance to this case. The plaintiffs allege no procedural defects in the decision-making process, and contend that their constitutional rights have been violated only in the unlikely event that the suspension order is upheld but the extension of the lease terms is not. The regulations expressly provide for the extension of the lease terms in the event of suspension, 43 C.F.R. § 3305a.4, and nothing in the OCS Act prohibits it. Thus, the Secretary's action in suspending operations under the leases can be found invalid only if it was unauthorized, 5 U.S.C. § 706(2)(C), or if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### 3. *Suspension in the Interest of Conservation is Authorized by Statute*

■ The Supreme Court has held that review under section 706(2)(C) requires an inquiry which delineates the range of choices available to the administrative official, and which makes "a determination of whether on the facts the [official's] decision can reasonably be said to be within that range." Citizens to Preserve Overton Park, *supra,* 401 U.S. at 416, 91 S.Ct. 823.

We first consider the range of choices available to the Secretary. With respect to this question, a careful reading of the statutes leads us to the conclusion that Congress authorized the Secretary to suspend operations under existing leases whenever he determines that the risk to the marine environment outweighs the immediate national interest in exploring and drilling for oil and gas.

Section 5(a)(1) of the Act, 43 U.S.C. § 1334(a)(1), provides:

> "The Secretary shall administer the provisions of this Act relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and *conservation of the natural resources of the outer Continental Shelf,* and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter. In the enforcement of conservation laws, rules, and regulations the Secretary is authorized to cooperate with the conservation agencies of the adjacent States. Without limiting the generality of the foregoing provisions of this section, the rules and regulations prescribed by the Secretary thereunder may provide for the assignment or relinquishment of leases, for the sale of royalty

oil and gas accruing or reserved to the United States at not less than market value, and, *in the interest of conservation,* for unitization, pooling, drilling agreements, *suspension of operations or production,* reduction of rentals or royalties, compensatory royalty agreements, subsurface storage of oil or gas' in any of said submerged lands, and drilling or other easements necessary for operational production." (Emphasis added.)

It is true, as plaintiffs argue, that the basic delegation of authority is to administer the leasing provisions of the Act and that these deal with exploration for and extraction of oil and gas and sulphur. But it is also true that, in authorizing the Secretary to issue regulations, the Act speaks of "conservation of the natural resources of the outer Continental Shelf," not just of conservation of oil, gas, sulphur and other mineral resources. We cannot conclude that the later language, permitting suspension of leases "in the interest of conservation" is confined to ·conservation of oil and gas as plaintiffs urge, even though the sentence also refers to "unitization, pooling, drilling agreements . . . reduction of rentals or royalties, compensatory royalty agreements, subsurface storage of oil or gas . . . " all of which do relate primarily to conservation of oil and gas. We think that the phrase "in the interest of conservation" refers back to the earlier phrase which we have quoted.

The phrase "conservation of the natural resources .of the outer Continental Shelf" is, on its face, broader than the meaning that plaintiffs would give it. Its natural meaning would encompass all such resources, not just oil and gas, sulphur and other minerals.

The OCS Act was originally introduced in Congress as Title III of the Submerged Lands Act, 67 Stat. 29, May 22, 1953. See 1953 U.S.Code Cong. & Admin.News 2177 ff, quoting S.Rep. 411, H.Rep. 413, Conf.Rep. 1031, 83rd Cong., 1st Sess. (1953). It was stricken from that Act, but reintroduced in the same form and ultimately adopted on August 7, 1953. In the legislative history, it is still referred to as Title III of the Submerged Lands Act, although it was finally adopted as an amendment to the Submerged Lands Act. It is clear, however, that the two Acts are in pari materia.

Section 2(e) of the Submerged Lands Act (43 U.S.C. § 1301(e)) provides

"The term 'natural resources' includes, without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges., kelp, and other marine animal and plant life but does not include water power, or the use of water for the production of power."

We think it entirely reasonable for the Secretary to conclude that the OCS Act, in § 5(a)(1), uses the phrase "natural resources" in the sense in which it is defined in Section 2(e) of the Submerged Lands Act.

If there were still any doubt in our minds that the Secretary's range of choices includes suspension to conserve the natural resources of the outer continental shelf as thus broadly construed, those doubts would be removed by the National Environmental Policy Act of 1969, 83 Stat. 852, 42 U.S.C. §§ 4321–4347 (NEPA). That Act provides in § 102, 42 U.S.C. § 4332:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, . . . "

In Calvert Cliffs' Coord. Com. v. United States A. E. Comm., 1971, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1112–1113, the court said:

"NEPA, first of all, makes environmental protection a part of the mandate of every federal agency and department. . . . This compulsion is most plainly stated in Section 102. . . . Congress also 'authorizes

and directs' that '(2) all agencies of the Federal Government shall' follow certain rigorous procedures in considering environmental values. Senator Jackson, NEPA's principal sponsor, stated that '[n]o agency will [now] be able to maintain that it has no mandate or no requirement to consider the environmental consequences of its actions.' He characterized the requirements of Section 102 as 'action-forcing' and stated that that '[o]therwise, these lofty declarations [in Section 101] are nothing more than that.'" (Footnotes omitted.)

In that case, the court held that NEPA compelled the Atomic Energy Commission to consider environmental matters, although the Atomic Energy Act contained no such requirement. (State of New Hampshire v. Atomic Energy Commission, 1 Cir., 1969, 406 F.2d 170, 175.) See also Zabel v. Tabb, 5 Cir., 1970, 430 P.2d 199, 211; Natural Resources Defense Council, Inc. v. Morton, D.C.Cir., 1972, 148 U.S.App.D.C. 5, 458 F.2d 827, 836, which deals with NEPA and the OCS Act.

### 4. The Secretary's Order is Within the Range of Choices Available to Him

█ There remains, however, a second question: could the Secretary suspend operations under the plaintiffs' leases for the reasons that he has invoked in this case, i. e., was this particular action within the range of choices available to him? Plaintiffs urge that it was not. They point out that the leases were made in full conformity with the OCS Act, that one purpose of the Act was to develop the resources of the outer Continental Shelf, particularly oil and gas, that the leases themselves contemplate, and indeed require, the plaintiffs to drill. They add to this the fact that the statement of the Geological Survey, on which the Secretary relied, shows that, if drilling is to be done, the ecological risks are acceptable. Finally, they point out that the Secretary himself recognizes that, under these circumstances, only Congress can permanently prevent drilling by cancelling the leases and paying the plaintiffs for their value. In essence, their argument is that the Secretary cannot suspend the leases to give himself a chance to persuade Congress to do what he now thinks ought to be done.

The argument is a powerful one, but we are unable to accept it. As we construe the OCS Act and NEPA, the Secretary has a continuing duty to guard all the resources of the outer Continental Shelf. After the leases in question were made, events occurred in the Santa Barbara Channel that were both unexpected and very dangerous to the environment. These caused the Secretary to reconsider the dangers to the natural resources of the area if drilling were to proceed under the leases.

On April 20, 1971, the Secretary sent to the Speaker of the House a letter, a proposed bill, and an environmental impact statement. In his letter, the Secretary recites the actions taken by him after the January 1969 blow out in the Santa Barbara Channel, and continues:

"At the same time, a second major action was taken. An order was signed which converted the existing two-mile buffer opposite the Santa Barbara State Oil Sanctuary into a permanent ecological preserve. Until this order was signed, the area which covers 21,000 acres, had no special legal status.

The enclosed bill proposed a more permanent solution to the problem. It would terminate 35 of the Federal leases and place the area covered by them, as well as certain other adjacent areas, into a National Energy Reserve. The reserve shall be available for lease only as determined by the President.

.  .  .  We believe that the proposed bill offers an equitable solution to the problem created by the 'blowout' in the Santa Barbara Channel area of the Outer Continental Shelf. It recognizes and protects the important environmental values of the San-

ta Barbara Channel, offers a mechanism for determining and paying just compensation to the lessees and preserves the resources.

In support of a similar Departmental proposal introduced in the 91st Congress, President Nixon stated:

' . . . This proposal for Santa Barbara illustrates our strong commitment of use of offshore lands in a balanced and responsible manner . . . This recommendation is based on the belief that immediate economic gains are not the only, or even the major, way of measuring the value of a geographic area. The ability of that area to sustain wildlife and its capacity to delight and inspire those who visit it for recreation can be far more important characteristics. This proposal recognizes that technology alone cannot bring national greatness, and that we must never pursue prosperity in a way that mortgages that nation's prosperity.' "

The Bill, however, did not come to a vote. A second suspension order was issued in April of 1973. The parties have stipulated that its validity will be controlled by our disposition of this case.[1] Under date of April 18, 1973, the Secretary re-submitted the bill. In his letter

(Cong.Rec.—Senate, S–10464, June 6, 1973) he said:

" . . . The Department's geologic and environmental analysis initiated following the blowout led to conclusions which, in light of the subsequent enactment of NEPA, required that the Department review the implications of operations on existing leases. Moreover, in the course of this review the Department also considered the existing energy crisis and the present pressing need for oil and natural gas. As a result of this review, it has been determined, on a balancing of all national interests, that the overall benefits to the Nation from the establishment of a National Energy Reserve as this bill provides, would outweigh any anticipated benefits which would come from permitting the present development of oil and gas deposits pursuant to these leases. Such a National Energy Reserve would complement both the Federal Ecological Preserve and the adjacent buffer zone and would protect the unique environmental and recreational qualities of the Santa Barbara Channel and the four channel Islands, which during the 92nd Congress were included in a proposal to establish a Channel Islands' National Park."

---

1. When the new order was issued, the plaintiffs filed a new action attacking its validity on June 8, 1973. On June 11, they stipulated that the issues in that action are the same as in the present action, and:
"3. That the *Gulf* case is controlling for the reasons set forth above and that the parties will be bound by the final judgment of that case in the manner as set forth hereinafter:
(a) If the final judgment in the *Gulf* case affirms the judgment of the District Court in that case on all points, then a judgment shall be entered forthwith by the District Court in this case providing that the 1973 Suspension Order is vacated and set aside and that the initial terms of the leases be extended for the period of time, if any, between the entry of final judgment in the *Gulf* case and the entry of final judgment in this action.
(b) If the final judgment in the *Gulf* case reverses the District Court's decision therein on all points without remanding any issues

and affirms the validity of the suspension order under attack there, judgment will be entered by the District Court in this case declaring the validity of the 1973 Suspension Order and dismissing the foregoing complaint with prejudice.
(c) If the final judgment in the *Gulf* case affirms paragraphs 1 and 3 of the District Court's judgment and conversely reverses, without remanding paragraph 2, then judgment in this case shall forthwith be entered and shall provide the relief described in paragraph 3(a) above;
(d) If the judgment of the Appellate Court in the *Gulf* case affirms, reverses or remands any paragraph or any combination of the paragraphs or portions thereof not specifically referred to above, of the Gulf District Court's judgment, the final judgment in *Gulf* of those issues will govern any judgment entered therein."
(Supp. Tr. Stipulation, page 2, line 25, to page 3, line 21.)

The bill was introduced in the Senate on June 6, 1973. So far as we are advised, it is still pending.

When the suspension order in question was made, drilling had not yet begun on the leases in question. In such circumstances, the fact that the leases might be terminated is highly relevant to an evaluation of the risks involved. For example, even if the threat to the marine environment were grave, the Secretary might be justified in refusing to order a suspension of operations if it were certain that drilling would eventually take place and there were no reason to believe that the risks would decrease with the passing of time. On the other hand, if there were a good possibility that drilling would have to be abandoned, it would certainly be rational for the Secretary to decide not to run the risk of substantial environmental damage, even if that risk were not acute. This is particularly true when, as the Geological Survey statement observes, the plugging of wells itself poses a risk of ecological damage. It would make little sense to require the Secretary to ignore reality by always assuming that a leased field will eventually be developed.

The fact that the bill in question was recommended by the Secretary does not affect this analysis. It cannot be seriously contended that he has no power to recommend legislation. Indeed, NEPA seems to require that he do so when he believes that legislation is necessary to enable him to carry out his duties under that Act. See § 103 and § 102(2)(C), 42 U.S.C. § 4333 and § 4332(2)(C). It would be a strange rule of law to insist that the Secretary's right hand ignore what his left hand is doing. There is nothing to support the plaintiffs' fears that the Secretary will use this procedure as a bootstrap method of discontinuing the off-shore exploration and drilling program entirely. Should such abuses occur, they can be dealt with in an appropriate case. We think that, given the fact that drilling had not yet begun and that it might have to be abandoned, the Secretary's evaluation of the environmental risks cannot be called arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

We do not hold that the Secretary can continue to issue comparable orders one after another and justify them by repeatedly having his proposed legislation introduced in the Congress. It is arguable that at some point, if Congress does not act, there must be an end to the matter. The parties' stipulation precludes our considering whether that point had been reached when the first suspension order expired in January of this year. We express no opinion as to whether such a point would be reached if and when the order presently in effect expires without congressional action. If that happens, and if the Secretary then should issue another suspension, that would be a new and different case.

The judgment is reversed.

CHAMBERS, Circuit Judge (concurring):

In my view, the second suspension order is before us only to demonstrate that our case, which is limited to the first suspension order, is not moot simply because it has expired by its terms.

The second suspension order is the subject of a second action pending in the district court and is not here on appeal.

I think the rationale of Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L. Ed. 865 (1920), justifies the first suspension order. I have my doubts about the second one, but that is not before us. Surely, as Judge Duniway indicates, the time arrives when enough is too much.

BOLDT, District Judge (concurring):

I concur in the opinion of Judge Duniway and also in the concurring comments of Judge Chambers.

Under the circumstances existing at and before the expiration of the first suspension order and continuing to exist at this time, I think it might be shown upon full hearing and consideration by the district court that the second sus-

pension was arbitrary, capricious and discriminatory. Among the matters which might be relevant and material in such a hearing are: (1) more than five years have passed since appellees paid approximately $153,000,000.00 for the leases in question, without as yet having been permitted to exercise their leasehold rights, arguably in violation of constitutional rights; (2) in oral argument appellees' counsel stated, without contradiction, that a considerable number of other lessees have been allowed to continue drilling for and extracting oil from lease sites in the Santa Barbara Channel during the suspension period applicable to appellees' leases; (3) the express purpose for which the Secretary of Interior is authorized to grant oil and gas leases under the Outer Continental Shelf Lands Act, enacted in 1953, is stated in section 8(a): "In order to meet the *urgent* needs for further exploration and development of the oil and gas deposits of the submerged land of the outer Continental Shelf" (emphasis added); (4) the 92nd Congress failed to act and thus far the 93rd Congress appears disinclined to act on the legislation proposed by the Secretary of the Interior to terminate these leases; and (5) the existing extremely critical national and international energy crisis.

In view of the circumstances suggested above and others that the parties might present, in my opinion the stipulation of counsel referred to by Judge Duniway, approved without hearing in the district court, now appears to have been improvident and might be held contrary to emergent national interests and vital public policy. In my view the validity of the stipulation and the right of the appellees to challenge the second suspension order on any available legal and factual basis ought to be heard and determined by the district court in the case now pending in that court.

### OPINION ON PETITION FOR A REHEARING

DUNIWAY, Circuit Judge.

Upon consideration of appellees' petition for a rehearing and of appellants'

response, we have partially revised our views about this case as follows:

■ *First*: The Secretary's order of April 21, 1971, which is under attack in this case, recites that it "shall terminate on January 2, 1973." The order was justified on the ground that its purpose was "to permit the Congress to consider pending legislation for the termination of thirty-five leases. . . ." The 92nd Congress adjourned, *sine die*, on October 18, 1972 (86 Stat. 1588), without taking any action on the Secretary's proposed legislation. While we continue to be of the opinion that the Secretary's order was valid when made, we now hold that its only raison d'etre vanished on October 18, 1972, and it became invalid on that day. The second session of the 92nd Congress is the fourth session of the Congress to which the Secretary's bill has been presented. Nothing substantial was done at any session to push the bill; no action was taken by the Congress at any session. Four tries are enough. We are therefore also of the opinion, and hold, that the Secretary's authority to suspend the leases to enable the Congress to consider the particular legislation that he had presented to the 92nd Congress vanished on October 18, 1972. The statutes involved do not give the Secretary carte blanche to continue suspending the leases until he finds a Congress that will accept his proposal. The new judgment to be entered should declare the validity of the April 21, 1971 order until October 18, 1972, and that it became invalid thereafter.

*Second*: The judgment appealed from was stayed by the district court on July 31, 1972. The stay was to terminate on January 2, 1973, or sooner if the judgment became final. Thus, technically, there was no stay after January 2, 1973. However, the Secretary issued a new suspension order on April 18, 1973, which has not been stayed. Thus, as a practical matter, the rights of appellants to drill under their leases have been continuously suspended since April 21, 1971.

The April 21, 1971 order provides:

The term of the foregoing leases shall be extended by a period equivalent to

the period of suspension in accordance with 43 CFR 3305a.4. Under the provisions of 43 CFR 3303.5 no payment of rental or minimum royalty will be required for or during the period of suspension.

That provision was valid and was effective until October 18, 1972.

The suspension order of 1973, however, contains no provision extending the terms of the leases. It does provide, however:

No payment of rental or minimum royalty will be required for or during the period of suspension, 43 CFR 3303.5.

■ The trial court held that, if the Secretary lacks power to suspend operations under the leases under the circumstances, "the Secretary does not have the power to extend the leases in question unless ordered by the Court so to do in order to effect equity." We agree. We have held that the Secretary's power to suspend for the reasons given by him expired on October 18, 1972. We hold that equity requires that the original term of each lease be extended by the entire time during which the Secretary's orders have purported to be effective. In addition, by reason of the stipulation of the parties appearing at pages 389–390 of the record, appellees are entitled to an additional extension of 183 days.

We also hold that the quoted provisions of the two orders of the Secretary relating to payment of the minimum rental or royalty should be enforced in the judgment.

*Third*: As Judge Chambers pointed out in his concurring opinion, the validity of the Secretary's new order of April 18, 1973 is not directly before us. The stipulation referred to in our opinion was made in another case, and was appropriately before us to show that this case is not moot. It appears to us, however, that under the stipulation in the action attacking that order, the effect of our holding is that the Secretary's April 18, 1973 order is also invalid. This litigation ought to be terminated. That can be accomplished by consolidating action No. 73–1302–FCW, pending in the district court, with this action, and entering a single new judgment in the two actions.

■ *Fourth*: Although it is unnecessary for us to do so in the light of our holding, we note that appellees have brought to our attention the fact that on November 13, 1973, the Secretary, acting through the Assistant Secretary for Energy and Minerals, advised the Senate Committee on Interior and Insular Affairs that his proposed legislation should not be enacted "at this time." He based this action on the existing energy crisis, on the enhancement of the Department's capability for regulating Outer Continental Shelf Operations, and on improvements in offshore drilling and production technology. If we are in error in holding that the order of April 2, 1971, and the Secretary's power to make such an order, expired on October 18, 1972, it is clear to us that his power to make such an order was fully spent not later than November 13, 1973, when the Secretary himself abandoned the sole basis upon which his orders purported to rest. This is an additional reason why this litigation and the companion case pending in the district court should be terminated.

The petition for a rehearing is denied.

The judgment appealed from is vacated, and the case is remanded to the district court with directions to consolidate this action with action No. 73–1302–FCW pending in that court, and for further proceedings consistent with this opinion.