678 F.2d 299
 17 ERC 1407, 219 U.S.App.D.C. 435, 12
Envtl. L. Rep. 20,690
 NATIONAL AUDUBON SOCIETY, INC., a Nonprofit Corporation
v.
James G. WATT, Secretary of the Department of the Interior
of the UnitedStates, Both Individually and in His
Official Capacity, et al.
Appeal of The STATE OF NORTH DAKOTA and Garrison Diversion
ConservancyDistrict.
NATIONAL AUDUBON SOCIETY, INC., a Nonprofit Corporation
v.
James G. WATT, Secretary of the Department of the Interior
of the UnitedStates, Both Individually and in His
Official Capacity, et al.
Appeal of The STATE OF NORTH DAKOTA and Garrison Diversion
ConservancyDistrict.
 Nos. 81-1641, 81-1763.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 18, 1982.
Decided May 7, 1982.
 
 Appeals from the United States District Court for the District of Columbia (D.C.Civil Action No. 76-00943).
 Frederick L. Miller, Jr., Washington, D. C., with whom J. Cathy Lichtenberg, Washington, D. C., was on the brief, for appellants State of North Dakota, et al.
 James C. Kilbourne, Atty., Dept. of Justice, Washington, D. C., with whom Robert K. Klarquist, Atty., Dept. of Justice, Washington, D. C., was on brief, for appellants Secretary Watt, et al. Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., entered an appearance for Secretary Watt, et al.
 Bruce J. Terris, Washington, D. C., for appellee Nat. Audubon Soc., Inc.
 Before WRIGHT, MacKINNON and WILKEY, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 Concurring opinion filed by Circuit Judge MacKINNON.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 This appeal arises out of protracted litigation concerning the federal government's plans to construct a 250,000-acre water development project, the Garrison Diversion Unit, in North Dakota. In 1977, in connection with a suit by the National Audubon Society (Audubon) seeking injunctive relief for alleged violations of federal statutes including the National Environmental Policy Act (NEPA), the Secretary of the Interior and Audubon agreed to the Stipulation and Order at issue in this case. The stipulation provided that the parties would suspend litigation on the merits, and that the government would not proceed with major construction on the Garrison project until the Secretary had completed two environmental studies and submitted proposed legislation to Congress, and until Congress had adopted legislation either reauthorizing, modifying, or deauthorizing the project. Five years later, under a new Administration, the government contends that the stipulation is no longer binding. The State of North Dakota and the Garrison Diversion Conservancy District assert that the stipulation was void ab initio. In contrast, Audubon maintains that the stipulation is fully binding and enforceable. The District Court granted an injunction enforcing the 1977 agreement.
 
 
 2
 Our decision in this case is based upon the context of the agreement and upon the Secretary's limited authority, under NEPA, to defer construction of the Garrison project. We hold that, even if the Stipulation and Order initially was valid and binding upon both parties, the parties' obligations were subsequently discharged under an implied condition when Congress did not adopt legislation regarding the Garrison project despite a reasonable opportunity to do so. We therefore reverse the judgment of the District Court. Our construction of the Stipulation and Order avoids potentially serious constitutional questions about the power of the Executive Branch to restrict its exercise of discretion by contract with a private party.I. FACTS
 
 A. The Garrison Diversion Unit
 
 3
 The Flood Control Act of 1944 adopted a long-range plan for flood control and water development in the Missouri River basin, including a project that would have irrigated more than a million acres in three states. Act of December 22, 1944, Pub.L.No.58-534, § 9, 58 Stat. 887, 891. In 1965 Congress authorized construction of a smaller version of the project, the Garrison Diversion Unit in North Dakota. Act of August 5, 1965, Pub.L.No.89-108, 79 Stat. 433. Section 1 of the statute provided that
 
 
 4
 the construction of a development providing for the irrigation of two hundred and fifty thousand acres, municipal and industrial water, fish and wildlife conservation and development, recreation, flood control, and other project purposes shall be prosecuted by the Department of the Interior substantially in accordance with the plans set out in the Bureau of Reclamation report dated November 1962 (revised February 1965) supplemental report to said House Document Numbered 325.
 
 
 5
 In subsequent years Congress steadily appropriated funds for construction.[1] After the passage of the National Environmental Policy Act, Pub.L.No.91-190, 83 Stat. 852 (1970), the Secretary of the Interior conducted a series of environmental impact studies. According to Audubon, these studies showed that the project would have devastating effects on the national wildlife refuge system, cause widespread destruction of prairie wetlands and other irreplaceable migratory wildlife habitat, destroyed thousands of acres of native prairie, and discharge polluting return flows into five rivers in two watersheds. Brief for appellee at 4. The Canadian government actively opposed the Garrison project, contending that project water flowing across the border would violate the Boundary Waters Treaty of 1909, 36 Stat. 2448, and would introduce fish diseases and fish parasites into Canadian waters with resulting damage to Canadian fisheries. Brief for appellee at 4.
 
 B. The Stipulation and Order
 
 6
 Audubon filed suit in May 1976 seeking to stop construction of the Garrison project, alleging that it would violate NEPA and other federal laws.[2] Among other contentions, Audubon alleged that the final environmental impact statement (EIS) prepared by the government was inadequate. Cross-motions for summary judgment were filed by Audubon and the Secretary of the Interior. These motions were pending when the Carter Administration took office and initiated a review of federal water projects to determine whether they were environmentally or economically unsound. To protect state interests the State of North Dakota and the Garrison Diversion Conservancy District (the state appellants) intervened in the case in March 1977. The following month the President recommended that the Garrison project be substantially reduced in size and that it be further evaluated after completion of an inquiry by a joint United States-Canada commission, the International Joint Commission.
 
 
 7
 The government and Audubon entered into negotiations which culminated in the Stipulation and Order at issue in this case.[3] This document is attached to our opinion as Appendix A. Signed on May 11, 1977, and approved by the District Court on May 18, 1977, the stipulation does not settle the underlying litigation and was not incorporated into a judgment. Referring to the President's recommendation that the Garrison project be substantially modified and to the diplomatic objections raised by the Canadian government, the agreement declares that "the parties deem a stay of this judicial proceeding to be warranted." It then provides for a stay of all proceedings "in accordance with the following terms and conditions(.)" Both parties would withdraw all pending motions and suspend litigation on the merits. The government would cease construction, land acquisition, and contracting,[4] except for specified activities, see Paragraph B of Stipulation and Order, and would not recommence work until all of the following events had occurred: (1) the government completed a comprehensive supplemental environmental impact statement describing "all reasonable alternatives for the project"; (2) the government prepared a mitigation plan for fish and wildlife; (3) the Secretary submitted the environmental study and the mitigation plan to Congress, accompanied by proposed legislation which either authorized an alternative project, reauthorized the original plan, or deauthorized the entire project; (4) Congress thereafter reauthorized the project or authorized an alternative plan; and (5) 60 days elapsed after congressional action. Paragraphs C and D.
 
 
 8
 The agreement was not expressly limited in duration, except that "(i)f any portion of the agreement becomes unenforceable, is violated, or is nullified, the other party to this agreement may abrogate the entire agreement or any portion of it." Paragraph H. The parties further agreed that "(t)his agreement shall be enforced by the United States District Court for the District of Columbia as part of the pending litigation." Id. The pleadings remained filed with the District Court.
 
 C. Subsequent Developments
 
 9
 The Secretary of the Interior completed a comprehensive supplemental EIS and a fish and wildlife mitigation plan; both were submitted to Congress. He also prepared proposed legislation authorizing a substantially modified Garrison project of approximately 96,000 acres, and on two occasions submitted his draft to the Office of Management and Budget for clearance. OMB denied approval to the proposed legislation on both occasions and returned the draft to the Secretary.[5] The Carter Administration thus did not submit any legislation to Congress regarding the Garrison project authorization. Congress has not independently enacted legislation to reauthorize, deauthorize, or modify the project.[6] On the other hand, appropriations for further construction on the Garrison project have regularly been approved by Congress since May 1977.[7]
 
 
 10
 From the outset the Stipulation and Order of May 11, 1977 has been embroiled in litigation. In a suit filed in the United States District Court for the District of North Dakota the State of North Dakota contended that the deferral of construction envisioned in the stipulation constituted an impoundment of appropriated funds, and that it was illegal because the government had not followed the procedures prescribed by the Impoundment Control Act. Subsequently the President submitted an impoundment message to Congress, 43 Fed.Reg. 21628 (May 18, 1978); the Senate disapproved the proposed deferral of funds for the Garrison project, S.Res. 525, 95th Cong., 2d Sess., 124 Cong.Rec. 25047-25048 (1978). Believing that the stipulation had been nullified, the Secretary of the Interior then decided to resume project activity.
 
 
 11
 Audubon petitioned the District Court for an injunction to enforce the stipulation, but lost. Ruling on Audubon's motion for preliminary injunctive relief, the District Court held on December 11, 1978 that the stipulation was not a valid contract because the parties had not reached a "meeting of the minds" on the meaning of the term "nullified." The order was appealed to this court. During the pendency of the appeal the stipulation was not in effect; the government resumed expenditure of appropriated funds on the project. In September 1979 Audubon and the Secretary resumed litigation on the merits of the underlying suit. On January 19, 1981 this court, by unpublished memorandum opinion, reversed the District Court's December 1978 order[8] and remanded for further consideration of whether the stipulation should be enforced. Joint Appendix (JA) 32-38.[9] This court directed the District Court, on remand, to consider whether the Senate impoundment resolution compelled the Secretary to proceed with the Garrison project, thereby nullifying the stipulation; whether the Secretary was empowered to enter into the stipulation and whether it could be enforced without impermissibly infringing on Executive discretion; and finally whether on balance injunctive relief was appropriate. JA 37.
 
 
 12
 On remand the District Court held that the stipulation was valid and enforceable. JA 38-50. The court wrote that neither the 1978 Senate impoundment resolution nor a line-item appropriation for fiscal year 1980, see note 7 supra, had nullified the stipulation; that the parties had not terminated the agreement by proceeding with the merits in 1979; and that the provisions of the stipulation were not illegal, void, or unenforceable. In the court's view, the terms of the stipulation were "clearly within (the Secretary's) power under NEPA to use 'all practicable means' to achieve the Act's substantive goals." JA 47. Enacted after the 1965 authorization act, NEPA "subjected further development of the project to the procedural and substantive provisions of that statute. The defendants have cited no cases in which the language of a public works authorization has been held to override the dictates of NEPA and the courts have not seen such acts as a bar to NEPA review." Id. Because Congress had not yet reauthorized, deauthorized, or modified the project as provided by the stipulation, the court ordered the government to desist from further work on the Garrison project. It also dismissed the case, leaving either party the right to reopen. This order, issued on May 6, 1981, is before us on appeal.[10]
 
 D. Contentions of the Parties
 
 13
 The federal defendants and the North Dakota intervening defendants have appealed the District Court's order. Both raise constitutional, statutory, and procedural challenges to the order; the State also contends that the stipulation has been terminated under its own provisions. Audubon asserts that the order should be affirmed because the Stipulation and Order continues to bind the parties.
 
 
 14
 The federal and state appellants contend that one Administration may not constitutionally bind its successors in the exercise of policymaking discretion, and that the judiciary may not command the Executive Branch to exercise its discretionary powers in any particular manner. Hence, they assert, neither the promise to submit legislation to Congress nor the promise to postpone construction until after congressional action may be enforced against the current Administration.[11] In contrast, Audubon maintains that the government exercised its discretion in 1977 by entering voluntarily into the agreement; once it did so, it may be held to its commitments under ordinary principles of contract law even if a new Administration has entered into office. Moreover, Audubon suggests that the stipulation respected the constitutional allocation of powers: "Recognizing that Congress would and should have the last word on the Garrison Project, the stipulation legitimately suspended project activity, so that options will be preserved for Congress and irretrievable commitments avoided until Congress has acted." Brief for appellee at 15.[12]
 
 
 15
 On statutory grounds, the Secretary maintains that the National Environmental Policy Act permits the government to delay implementation of the 1965 authorization act only until Congress has had a reasonable opportunity to reconsider its earlier mandate, and that this period has elapsed. In contrast, the State insists that the Secretary did not rely on NEPA when he entered into the stipulation, and that he could not have done so because the 1965 act's mandate to construct the 250,000-acre Garrison project overrides any conflicting provisions in NEPA. In response, Audubon asserts that the 1965 act leaves the Secretary unlimited discretion to delay or defer construction,[13] and that the stipulation-prompted by environmental concerns-was a proper means to further the substantive environmental goals established by NEPA.
 
 
 16
 The state appellants contend that events between 1977 and 1981 "nullified" the stipulation, as contemplated in Paragraph H.[14] They argue that passage of the 1978 impoundment resolution by the Senate permanently nullified the stipulation by disabling the Secretary from complying with its terms,[15] and in the alternative that the stipulation was voluntarily terminated by the parties when they proceeded with the merits of the case in 1979. See page 304 supra.[16] In contrast, Audubon takes the position that the 1978 impoundment resolution was effective for one year only and did not permanently affect the stipulation. It also contends that Audubon did not abandon its rights under the stipulation by litigating on the merits pending appeal of the District Court's 1978 order, because during that period Audubon lacked the benefit of any of the provisions of the stipulation.
 
 
 17
 Procedurally, federal and state appellants assert that the District Court improperly granted an injunction to enforce the Stipulation and Order without balancing the equities to determine whether injunctive relief was appropriate. In appellants' view, the equities-including the limited construction plans for fiscal 1982, the rising costs of construction, and the need for project water supplies in North Dakota-weighed strongly against an injunction. Audubon, in contrast, maintains that the District Court was not required to balance the equities once it determined that a binding contract fixed the rights and duties of the parties.
 
 
 18
 We conclude that the District Court erred in granting the injunctive relief requested by Audubon. We interpret the stipulation to include an implied condition releasing the parties from their obligations if Congress fails to take action after it has had a reasonable opportunity to do so. The condition has occurred, and the parties are therefore no longer bound by the stipulation. It is unnecessary for us to reach the broad and far-reaching constitutional questions briefed by the federal and state appellants.[17]
 
 
 19
 II. THE STIPULATION AND ORDER OF MAY 11, 1977
 
 
 20
 The Stipulation and Order signed by the Audubon Society and the Secretary of the Interior was a procedural device to stay the litigation pending further review of the economic and environmental impacts of the Garrison project. The agreement provides that no further construction will be undertaken until the Secretary has completed the specified studies and has submitted proposed legislation to Congress, "and Congress has thereafter reauthorized the project or authorized an option for project development, and an additional 60 days have elapsed." This language contains no express durational limitation. Nevertheless stipulations, like other contracts, must be interpreted in light of the circumstances under which the agreement was made. See Chouest v. A & P Boat Rentals, Inc., 472 F.2d 1026, 1028 (5th Cir.), cert. denied, 412 U.S. 949, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973) (interpreting disputed language in stipulation in light of interests of parties at time stipulation was made); Hetherington & Berner, Inc. v. Melvin Pine & Co., 256 F.2d 103, 107 (2d Cir. 1958) (considering meaning of stipulation in light of its "obvious purpose"); United States ex rel. Hoehn v. Shaughnessy, 175 F.2d 116 (2d Cir.), cert. denied, 338 U.S. 872, 70 S.Ct. 142, 94 L.Ed. 535 (1949) (stipulation "should be construed in the light of its evident purpose," discerned from circumstances); cf. 3 A. Corbin, Contracts § 545 (1960); Restatement (Second) of Contracts § 228(1) (Tent. Draft No. 5, 1970). In addition, if possible each provision should be given a meaning that avoids legal infirmity. 3 A. Corbin, supra, § 546 at 170-171; Restatement (Second) of Contracts, supra, § 229(a). Both of these canons of interpretation lead us to the conclusion that the Stipulation and Order did not bind the government unconditionally to postpone construction until 60 days after Congress enacted new legislation.
 
 A. The Context of the Agreement
 
 21
 The opening paragraphs of the Stipulation and Order clearly set forth the purposes of the parties at the time they entered into the agreement. Two factors, according to the stipulation's preamble, militated in favor of a stay-"the uncertainties raised by the President's recommendation that the Garrison Diversion Unit be substantially modified," and the "issues pending in regard to the Boundary Waters Treaty of 1909 between Canada and the United States." Recognizing that the issues raised by plaintiff Audubon "may become altered as a result of the actions of the federal defendants under this agreement and subsequent congressional action," they agreed to a stay of the proceedings "to conserve judicial resources" and to "afford the Secretary of Interior and the Commissioner of the Bureau of Reclamation an opportunity to undertake the commitments made herein." The need for a stay was premised, in large part, on a new policy toward federal water projects adopted by an incoming Administration.
 
 
 22
 Perhaps because the parties recognized the contingencies inherent in discretionary policymaking, their agreement did not constitute a final settlement of the litigation. Nor did it result in a partial judgment or decree. Paragraph F expressly provides:
 
 
 23
 Nothing in this stipulation and order shall be construed as precluding any party from taking any position relative to the project or its alternatives it deems appropriate, or as conceding any of the legal issues or defenses thereto raised by the pleadings. * * *
 
 
 24
 Although the parties withdrew all pending motions and responses without prejudice, they agreed that the pleadings would remain filed. The choice of a stipulation-an agreement forming part of a continuing litigation proceeding-rather than a conclusive settlement indicates that the parties intended the stay of proceedings to be temporary. In this context, we do not believe that the stipulation unconditionally binds the government to defer construction of the statutorily-authorized Garrison project until after Congress has passed new legislation. This contingency, beyond the control of either party, might never occur. We will not construe the stipulation so that it could bind the parties long after it has served its principal purpose-to permit the Carter Administration to reconsider federal water development projects.
 
 
 25
 B. Legal Constraints as Guides to Interpretation of the Agreement
 
 
 26
 Furthermore, to the extent possible the stipulation should be construed so that the Secretary's obligations remain within the bounds of his official authority. It is well established that a government official may not bind the United States by entering into a contract to perform unauthorized acts. Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); United States ex rel. Hoehn v. Shaughnessy, supra, 175 F.2d at 118 (applying general principle to stipulation allegedly made by government official). A party contracting with a government agency may not rely on the agent's assertion of authority if such authority does not exist.[18] Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Therefore, the Secretary's power to postpone construction of the Garrison Diversion Unit establishes the outer limits of validity of the Stipulation and Order.[19] These limits also shape our interpretation of the meaning of the stipulation.
 
 1. The 1965 Authorization Act
 
 27
 The 1965 legislation authorizing construction of the Garrison Diversion Unit states that construction of a 250,000-acre project "shall be prosecuted by the Department of the Interior substantially in accordance with the plans set out in the Bureau of Reclamation report dated November 1962 (revised February 1965) * * *." The state appellants urge us to hold that this legislation was "mandatory" and left no room for delays pending the submission of legislation. We reject this interpretation. The statute did not establish a specific construction schedule, nor did it even express a congressional preference for expeditious construction, in contrast with some statutes.[20]
 
 
 28
 The act did, however, express Congress' intent that the 250,000-acre project should be built. See S.Rep.No.89-470, 89th Cong., 1st Sess. 3, 8 (1965); H.R.Rep.No.89-282, 89th Cong., 1st Sess. 4, 11 (1965), U.S.Code Cong. & Admin.News 1965, p. 475. We therefore do not accept the Audubon Society's view that the Secretary was free to postpone construction indefinitely, see note 13 supra. In our view, the statute permits the Secretary to exercise limited discretion over the timing of construction to the extent authorized by the National Environmental Policy Act.[21] Although the state appellants invoke cases holding that the requirements of NEPA do not apply when there is a clear conflict between NEPA's commands and those of another statute, see, e.g., Flint Ridge Development Co. v. Scenic Rivers Ass'n of Oklahoma, 426 U.S. 776, 778, 96 S.Ct. 2430, 2433, 49 L.Ed.2d 205 (1976) (requirements of Interstate Land Sales Full Disclosure Act); Natural Resources Defense Council, Inc. v. Berklund, 609 F.2d 553 (D.C.Cir.1979) (Mineral Leasing Act of 1920), those cases are inapposite here. There is no conflict between NEPA and the provisions of the 1965 act. We will not stretch the word "shall" to require the Secretary to ignore the provisions of all other statutes.[22]
 
 2. The National Environmental Policy Act
 
 29
 NEPA requires the federal government to "use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" in order to preserve the environment for succeeding generations, to attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences, and to achieve other environmental goals. 42 U.S.C. § 4331(b) (1976). The statute specifically requires federal agencies to perform full environmental impact studies before deciding whether to undertake any "major Federal action." Id. § 4332(2). If the procedural mandates of NEPA have not been fulfilled, then the federal courts may enjoin a proposed federal action in order to assure that environmental information is properly brought to bear on the decisionmaking process. See Realty Income Trust v. Eckerd, 564 F.2d 447, 456 (D.C.Cir.1977) (discussing circumstances under which injunctions are appropriate).
 
 
 30
 In Gulf Oil Corp. v. Morton, 493 F.2d 141, 146 (9th Cir. 1973), the Ninth Circuit held that NEPA also confers limited discretionary power on federal officials to postpone implementation of authorized federal programs or projects which may have serious environmental consequences. In Gulf Oil the Secretary of the Interior had determined that continued offshore drilling would endanger the ecology of the Santa Barbara Channel. He therefore had issued an order suspending oil and gas drilling operations under existing leases authorized by statute, and attempted to persuade Congress to adopt legislation terminating the leasing program and providing compensation for holders of existing leases. The court held that, if the Secretary concluded that amendments to legislation were necessary to protect the environment, NEPA authorized him to suspend compliance with the Outer Continental Shelf Lands Act drilling provisions while he sought to convince Congress to take action. Noting the Secretary's "continuing responsibility" under NEPA to protect the environment, the court wrote, "It would be a strange rule of law to insist that the Secretary's right hand ignore what his left hand is doing."[23] 493 F.2d at 148. Cf. Canal Authority v. Callaway, 489 F.2d 567, 577 (5th Cir. 1974) (in context of preliminary injunction, noting Gulf Oil holding with approval to support "temporary administrative action to meet previously unconsidered environmental dangers").
 
 
 31
 However, the court added in Gulf Oil that "at some point, if Congress does not act, there must be an end to the matter." 493 F.2d at 148. Many factors contribute to congressional action or inaction; no one can predict or promise that Congress will act on any given substantive issue. Although NEPA may permit the government, in its discretion, to postpone implementation of other federal statutes temporarily for environmental reasons, it certainly does not allow these statutes to be repealed sub silentio at the administrative level. Nor does it allow the Secretary, in effect, to compel Congress to authorize the same project twice in order to assure that implementation will go forward. In Gulf Oil the court held that the suspension order had become invalid after the end of the fourth session of Congress to which the Secretary's bill had been presented-a session in which no congressional action was taken. "The statutes involved do not give the Secretary carte blanche to continue suspending the leases until he finds a Congress that will accept his proposal." Id. at 149 (opinion on petition for rehearing). Under NEPA the outer limits of discretionary deferral authority are reached after Congress has had a reasonable opportunity to act. Because any authority conferred by NEPA to defer statutorily-authorized programs is permissive and not mandatory, the responsible government official determines when a "reasonable opportunity" has passed.
 
 
 32
 Applying these principles to the Garrison project, the Secretary was authorized, indeed required, to defer construction until he had prepared environmental impact statements in compliance with NEPA. He may also have had discretionary authority to delay construction until Congress had a reasonable opportunity to reconsider its earlier mandate in light of newly available environmental information.[24] But he was not legally empowered to promise unconditionally to defer construction until 60 days after Congress took action on the Garrison project authorization, regardless of how long congressional action may be deferred.
 
 C. Implying a Reasonable Time Limit
 
 33
 In order to preserve the legality of the stipulation to the extent possible, and to reflect the purposes originally stated by the parties, we construe the stipulation to include an implied condition subsequent. As the Restatement (Second) of Contracts recognizes, a contract may have omitted a term which is essential to a determination of the rights and duties of the parties, either because they failed to foresee the situation which later arises, or because their expectations rested on unarticulated assumptions. Restatement (Second) of Contracts, supra, § 230, Comment b. In this situation, "a term which is reasonable in the circumstances is supplied by the court." Id.
 
 
 34
 In this case, we supply an implied condition to Paragraph D, under which the government agrees not to undertake further construction until the specified studies have been completed and until Congress has thereafter reauthorized or modified the project. If Congress fails to act after having had a reasonable opportunity to reconsider the 1965 authorizing legislation, the parties shall no longer be bound by the stipulation.[25] Either party might decide that the implied condition has occurred, discharging its contractual obligations; the other party is then free to seek judicial relief. Because the implied condition in this case is defined with reference to the Secretary's discretionary power under NEPA to delay implementation, the courts will give substantial deference if the Secretary decides that Congress has already had a reasonable opportunity to take action.
 
 D. Occurrence of the Implied Condition
 
 35
 Until Congress had a reasonable opportunity to adopt new legislation concerning the Garrison project, the Stipulation and Order may have been binding on the parties. See note 19 supra. As the government contends, however, the implied condition had occurred before the District Court granted its injunction enforcing the stipulation. The Secretary of the Interior completed the comprehensive supplemental EIS and the mitigation plan for fish and wildlife specified in Paragraph C and submitted them to Congress. In addition, Congress was informed of the continuing discussions with the Canadian government and received a copy of the 1977 report of the United States-Canada International Joint Commission. Reply brief for federal appellants at 11. Although OMB did not submit the Secretary's proposed legislation to Congress, the record shows clearly that the controversy over the Garrison project was brought to the attention of Congress.[26] Nevertheless, Congress took no action to modify the Garrison project or to deauthorize it.[27] Indeed, several appropriations bills passed since 1977 have included funds for construction of the Garrison Diversion Unit. See note 7 supra. We therefore accept the government's contention that Congress has had a reasonable opportunity to reconsider the 1965 authorizing legislation and that the government's obligations under the stipulation, as well as Audubon's obligations, have been discharged.[28]
 
 III. CONCLUSION
 
 36
 As properly construed, the stipulation is no longer binding on the parties. We therefore need not consider any of the alternative grounds for invalidating the stipulation. In particular, we need not consider the difficult and far-reaching constitutional issues addressed in the briefs. It would be inappropriate for this court to issue an advisory opinion on whether the government may be bound by an agreement to introduce legislation into Congress, whether the government may commit itself not to implement authorizing legislation until Congress takes further action, and more generally whether the government may enter into judicially enforceable contracts relinquishing or limiting its policymaking discretion.
 
 
 37
 For the reasons stated in this opinion, we reverse the District Court's order enjoining the government to comply with the May 11, 1977 Stipulation and Order and dismissing the case with the right to reopen. The case should now proceed in the District Court on the merits of the underlying litigation.
 
 So ordered.APPENDIX A
 
 38
 UNITED STATES DISTRICT COURT OF DISTRICT OF COLUMBIA
 
 Civil No. 76-0943
 
 39
 NATIONAL AUDUBON SOCIETY, INC., Plaintiff,
 
 
 40
 v.
 
 
 41
 CECIL D. ANDRUS, et al., Defendants.
 
 
 42
 (Filed May 19, 1977)
 
 
 43
 (Approved - 5/18/77 Richey, J.)
 
 STIPULATION AND ORDER
 
 44
 National Audubon Society filed its complaint in May 1976, raising issues relative to the environmental assessment of the Garrison Diversion Unit (the project) presented in a final environmental statement (FES 74-3, as supplemented by FES 74-21) issued in January 1974 by the federal defendants, the Secretary of the Interior and the Commissioner of the Bureau of Reclamation, as well as issues relative to alleged violations of the Fish and Wildlife Coordination Act and the Migratory Bird Treaty and Act. Pending before the court are cross-motions for summary judgment and plaintiff's motion for preliminary injunction, plus ancillary matters. The parties to this agreement recognize that the issues raised in the complaint are difficult and complex, and that their resolution in judicial proceedings is uncertain. A judgment entered in this case at this time may be a less than satisfactory conclusion for the parties, or any of them, due to the range of relief available to the court. In light of the difficulties associated with the litigation noted above and the uncertainties raised by the President's recommendation that the Garrison Diversion Unit be substantially modified, as well as the issues pending in regard to the Boundary Waters Treaty of 1909 between Canada and the United States, the parties deem a stay of this judicial proceeding to be warranted.
 
 
 45
 The parties recognize that the issues raised by plaintiff may become altered as a result of the actions of the federal defendants under this agreement and subsequent congressional action.
 
 
 46
 Accordingly, to conserve judicial resources and afford the Secretary of Interior and the Commissioner of the Bureau of Reclamation an opportunity to undertake the commitments made herein, the parties agree to a stay of all proceedings in this action, in accordance with the following terms and conditions:
 
 
 47
 A. With the exception of the actions described in paragraph B, no further construction will be carried out; no further contracts will be entered into; no advertisement for bids on contracts will be published; no further land will be purchased, or otherwise acquired, or negotiated for; no survey will be made and no detailed engineering plans leading to the preparation of construction specifications shall be developed until the conditions set forth in paragraph D have been complied with.
 
 B. Plaintiff agrees that:
 
 48
 1) McClusky Canal may be completed, provided that: the headgates located at the west end of the McClusky Canal shall remain as presently sealed and the canal plugs located at Stations 3135 k 00 (between Hoffer Lake and Skunk Lake), 3173 k 00 (Skunk Lake), at the end of Reach 3A and in Reach 2 at the Chain-of-Lakes, and coffer dams implaced for repair of the large slide shall remain in place until Missouri River water is required for orderly development of irrigation service areas outside of the Missouri River Basin; but in any event, these barriers shall not be removed until the conditions described in paragraph D are met. It is not the intent of this agreement to prevent work related to McClusky Canal for the following and similar activities: slide repair, erosion control, road and utilities relocation, completion of the existing fish screen complex contracts, landscaping and parking areas, and operations and maintenance buildings.
 
 
 49
 2) This agreement is not intended to prevent work related to or execution of contracts for research, operation and maintenance equipment, and office supplies, preparation of an environmental statement and preparation of studies supporting authorizing legislation.
 
 
 50
 3) Further, acquisition of land relating to the Lonetree Reservoir from a maximum of eight landowners may be completed, provided that this land may only be acquired if the contracts for this acquisition have already been executed prior to the date of this agreement, the Department of the Interior notifies each landowner that he or she need not sell his or her land, and the landowners continue to desire to sell their land. Plaintiff will be notified of the names and addresses of each landowner, including, if more than one person has an interest in a particular piece of land, each such person. Plaintiff will have the right to discuss with each landowner whether he or she desires to sell the land. The Department of the Interior shall not acquire any such land until at least 14 days from the date of the above notification to plaintiff.
 
 
 51
 C. The federal defendants agree to complete a comprehensive supplementary environmental statement in compliance with NEPA that describes all reasonable alternatives for the project, including, but not limited to, the project as currently authorized by Congress, the project as proposed by President Carter (including modification of that proposal by elimination of the East Oakes Service Area and Taayer Reservoir), utilizing a sand filter for water entering the Red River Basin from the McClusky Canal (designated primarily for municipal and industrial use and perhaps other uses), use of a pipeline to connect the McClusky Canal to a point on the James River, use of the McClusky Canal without further significant construction, and no project. The Bureau of Reclamation, within its reasonable discretion, will consult with plaintiff and others concerning the scope and content of the environmental statement before and during its preparation. The draft environmental statement shall be completed on or about January 1, 1978, filed with the Council on Environmental Quality and accompany proposed legislation by the Secretary of Interior to Congress requesting authorization of an option for project development described in the environmental statement, or reauthorization or deauthorization of the project. (Sentence deleted by agreement of the parties.) Defendants will endeavor to complete and transmit to Congress the final environmental statement within 90 days after filing of the draft with the Council on Environmental Quality. A fish and wildlife mitigation plan will be submitted with the proposed legislation to Congress. The plan will include a discussion of compensation for losses resulting from wetland drainage, stream channelization, cultivation of native prairie, creation of hazardous nesting cover, adverse impacts on national wildlife refuges, introduction of rough fish, increased flows, and alteration of water temperatures.
 
 
 52
 D. No action prohibited by paragraph A will be undertaken until the actions taken pursuant to paragraph C have been completed and Congress has thereafter reauthorized the project or authorized an option for project development, and an additional 60 days have elapsed.
 
 
 53
 E. The Secretary of Interior will notify Congress of this stipulation and order by transmitting a copy thereof to the appropriate committees of Congress. In the letters of transmittal, the Secretary will indicate that it is the belief of the parties that consideration of authorizing legislation relative to the Garrison Diversion Unit should await submittal and consideration by Congress of the proposed legislation and environmental statement described herein.
 
 
 54
 F. Nothing in this stipulation and order shall be construed as precluding any party from taking any position relative to the project or its alternatives it deems appropriate, or as conceding any of the legal issues or defenses thereto raised by the pleadings. The parties agree not to take any action to attempt to nullify this agreement.
 
 
 55
 G. All pending motions and responses thereto are hereby withdrawn without prejudice by the parties upon approval of this stipulation and entry of this order by the court. The pleadings shall remain filed.
 
 
 56
 H. This agreement is non-severable. If any portion of the agreement becomes unenforceable, is violated, or is nullified, the other party to this agreement may abrogate the entire agreement or any portion of it. This agreement shall be enforced by the United States District Court for the District of Columbia as part of the pending litigation.
 
 
 57
 Dated May 11, 1977.
 
 
 58
 /s/ Charles K. Dayton
 
 
 59
 /s/ Charles K. Dayton
 
 
 60
 /s/ Dayton, Herman & Graham
 
 
 61
 /s/ 800 Midland Bank Building
 
 
 62
 /s/ Minneapolis, Minnesota 55401
 
 
 63
 /s/ Bruce J. Terris
 
 
 64
 /s/ Bruce J. Terris
 
 
 65
 /s/ 1526 18th Street, N.W.
 
 
 66
 /s/ Washington, D. C. 20036
 
 
 67
 /s/ 202-332-1882
 
 
 68
 /s/ Attorneys for Plaintiff
 
 APPROVED:
 
 69
 /s/ Charles H. Callison
 
 
 70
 /s/ Charles H. Callison
 
 
 71
 /s/ Executive Vice-President
 
 
 72
 /s/ National Audubon Society
 
 
 73
 /s/ Andrew F. Walch
 
 
 74
 /s/ Andrew F. Walch
 
 
 75
 /s/ Attorney, Department of Justice
 
 
 76
 /s/ Washington, D. C. 20530
 
 
 77
 /s/ Tim E. Sleeth
 
 
 78
 /s/ Tim E. Sleeth
 
 
 79
 /s/ Attorney, Department of Justice
 
 
 80
 /s/ Washington, D. C. 20530
 
 
 81
 /s/ Attorneys for Federal Defendants.
 
 APPROVED:
 
 82
 /s/ Cecil D. Andrus
 
 
 83
 /s/ Cecil D. Andrus
 
 
 84
 /s/ Secretary of Interior
 
 
 85
 MacKINNON, Circuit Judge (concurring).
 
 
 86
 I concur in the foregoing opinion but write additionally to stress two points. First, in my view the record indicates that the appellee Society (Society) has delayed the Garrison Diversion through a misuse of the National Environmental Protection Act (NEPA). The Society, by indirect means, has attempted to enforce a substantive environmental mandate allegedly based on the NEPA that is not authorized by the terms of the law. Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).
 
 
 87
 The requirements of the NEPA are limited to the requirement that the agencies "consider" environmental impact in all their matters. As the Supreme Court stated per curiam in Strycker's Bay, supra, NEPA is "essentially (a) procedural (statute) ... designed to insure a fully informed and well-considered decision (but not one) ... that (compels) an agency, in selecting a course of action, (to) elevate environmental concerns over other appropriate considerations ... (T)he only rule for a court is to insure that the agency has considered the environmental consequences ..." 444 U.S. at 227, 100 S.Ct. at 500; citing Kleppe v. Sierra Club, supra, 427 U.S. at 410, n.21, 96 S.Ct. at 2730 (emphasis added).
 
 
 88
 Practically every major construction project authorized by Congress affects the environment to some degree. The agencies must "consider" these effects, but there is nothing in NEPA that requires any agency to refuse to proceed with any project, or to alter it, because of the environmental consequences it has "considered" as required by NEPA. Agencies must "consult" with experts (42 U.S.C. § 4332(2)(C)), "solicit the views" of outsiders, id., (D)(IV), "study, develop and describe appropriate alternatives ..." id., (E), and use "ecological information in the planning and development of resource-oriented projects," id., (H). Having done all this, however, and having given consideration to such information, they should be immune from incessant litigation. Some organizations by a misuse of NEPA have directly caused the cost of some projects to increase by billions of dollars.
 
 
 89
 Second, that Executive Branch officials and private parties cannot by contract or agreement compel Congress to adopt legislation to change a previously authorized project unless there is something illegal about the project Congress has authorized.
 
 
 
 [1]
 The project is now approximately 20% complete. Brief for appellee at 12
 
 
 [2]
 Audubon alleged that construction of the project violated the National Environmental Policy Act, 42 U.S.C. §§ 4331(b), 4332(2)(A), 4332(2)(C), 4332(2) (E) (1976) (substantive goals and environmental impact statement procedures); the Fish and Wildlife Coordination Act of 1958, 16 U.S.C. §§ 662, 663 (1976); Article V of the Convention Between the United States and Great Britain for the Protection of Migratory Birds, 39 Stat. 1702, 1704 (1916); and the Migratory Bird Treaty Act, 16 U.S.C. §§ 703, 704 (1976). Complaint for Declaratory and Injunctive Relief, D. D.C. Civil Action No. 76-0943, filed May 27, 1976
 
 
 [3]
 The State of North Dakota and the Garrison Diversion Conservancy District, intervenor-defendants in the District Court, did not participate in the negotiations and did not sign the agreement. Brief for state appellants at 6
 
 
 [4]
 These activities will be described in this opinion as "project construction."
 
 
 [5]
 Internal Executive Branch procedures require OMB clearance before any legislation proposed by an agency is submitted to Congress. OMB Circular A-19
 
 
 [6]
 In November 1981 the Senate adopted an amendment to the 1982 energy and water development appropriations bill that directed the Secretary to proceed with construction of the initial stage of the Garrison Diversion Unit, notwithstanding the Stipulation and Order. Although the conference committee retained the provision, the House rejected the amendment by a vote of 314 to 67. The Senate receded from its position on November 21, 1981. Audubon's supplementary memorandum at 1-3
 
 
 [7]
 In 1977, aware of the Stipulation and Order, Congress designated $18.66 million of a lump sum Bureau of Reclamation appropriation for further construction on the Garrison project. This appropriation was to remain available until it was expended. See Public Works for Water and Power Development and Energy Research Appropriation Act of 1978, Pub.L.95-96, 91 Stat. 797, 801; H.R.Rep.No.95-507, 95th Cong., 1st Sess. 48, 50 (1977) (conference report agreeing with language of Senate report); S.Rep.No.95-301, 95th Cong., 1st Sess. 78-80 (1977) (criticizing stipulation and reaffirming support for Garrison project as authorized in 1965). The State then moved to dismiss the stayed litigation as moot, but the District Court denied the motion on the ground that congressional appropriations did not establish the adequacy of the existing environmental impact statement. Nat'l Audubon Society, Inc. v. Andrus, 442 F.Supp. 42 (D.D.C.1977)
 During the appropriations process for fiscal year 1979, both House and Senate appropriations committees and the conference committee noted that approximately $18 million of the 1978 appropriation for Garrison had not been spent and reaffirmed their view that the funds should be expended during fiscal year 1979. H.R.Rep.No.95-1247, 95th Cong., 2d Sess. 116 (1978); S.Rep.No.95-1069, 95th Cong., 2d Sess. 104 (1978); H.R.Rep.No.95-1490, 95th Cong., 2d Sess. 58 (1978) (conference report). For fiscal year 1980 Congress adopted a line-item appropriation of $9.7 million for the Garrison project. Supplemental Appropriations and Rescission Act of 1980, Pub.L.No.96-304, 94 Stat. 857, 872. Most recently, the Energy and Water Development Appropriation Act of 1982, Pub.L.No. 97-88, 95 Stat. 1135, 1138, includes a lump sum appropriation of which $4 million has been designated for the Garrison project. See H.R.Rep.No.97-177, 97th Cong., 1st Sess. 62 (1981); S.Rep.No.97-256, 97th Cong., 1st Sess. 75 (1981).
 
 
 [8]
 This court held that the term "nullify" in the stipulation was not ambiguous, thus rejecting the District Court's ground for invalidating the agreement. JA 35-37. But it added that "(i)t does not necessarily follow * * * that the District Court erred in denying the requested preliminary injunction, for further questions persist." JA 37
 
 
 [9]
 At that time cross-motions for summary judgment, argued in December 1980, were again pending before the District Court. To avoid jeopardizing its compliance with the stipulation, after this court's decision Audubon asked the District Court to postpone any decision on the merits of the case until it had ruled on the enforceability of the stipulation. Brief for appellee at 53
 
 
 [10]
 The federal appellants are Secretary of the Interior James G. Watt and Commissioner of Reclamation Robert N. Broadbent. The state appellants are the State of North Dakota and the Garrison Diversion Conservancy District, a North Dakota governmental entity
 
 
 [11]
 The State also contends that, to the extent the stipulation purported to resolve legal issues, it usurped the judicial function. Brief for state appellants at 39-43
 
 
 [12]
 These issues, although extremely interesting, are novel and far-reaching. We are not aware of any appellate cases determining the enforceability of contracts between the government and a private party by which the government promises to restrict its exercise of policymaking discretion. General principles may be drawn from dictum in cases dealing with the constitutional prohibition on state laws impairing the obligation of contracts, U.S.Const., Art. I, § 10; from cases upholding one Administration's decision to change a policy adopted by its predecessors; from cases limiting the power of the judiciary, in the absence of any contract, to direct the Executive in the exercise of its discretion; and from cases holding that particular contracts made by one Administration are binding on its successors. However, these broad principles might point to different results in different contexts, depending on the legal rights of the private party, the type of policymaking discretion involved, and the extent to which, and for how long, the government's discretion is curtailed
 
 
 [13]
 At oral argument counsel for Audubon took the position that NEPA would permit indefinite postponement of the Garrison project if Congress did not reauthorize, deauthorize, or modify the project
 
 
 [14]
 Paragraph H of the Stipulation and Order provides:
 This agreement is non-severable. If any portion of the agreement becomes unenforceable, is violated, or is nullified, the other party to this agreement may abrogate the entire agreement or any portion of it. * * *
 
 
 [15]
 The government does not join in this argument. Reply brief for federal appellants at 14-17. It takes the view that the impoundment resolution could not compel the government to spend part of a lump-sum appropriation for any particular purpose
 
 
 [16]
 In addition, before the District Court the federal appellants argued that passage of a line-item appropriation for Garrison in 1980 had nullified the stipulation. The District Court rejected this contention, and the federal appellants do not raise it here
 
 
 [17]
 If the record presents another ground upon which the case may be disposed of, federal courts should avoid passing upon constitutional questions. See Rescue Army v. Municipal Court of Los Angeles, 331 U.S. 549, 569, 67 S.Ct. 1409, 1420, 91 L.Ed. 1666 (1947). The policy of strict necessity in disposing of constitutional issues is based on "all that goes to make up the unique place and character, in our scheme, of judicial review of governmental action for constitutionality." Id. at 571, 67 S.Ct. at 1421
 
 
 [18]
 This principle applies equally to the Department of Justice and the Department of the Interior. Thus, despite Audubon's reliance on the general authority of the Justice Department over the conduct of government litigation, the agreement of Justice Department officials to the stipulation does not compensate for the Secretary's lack of authority under NEPA
 
 
 [19]
 As noted above, our analysis of these outer limits leads us to conclude that the District Court improperly awarded injunctive relief to Audubon. We therefore need not address and express no opinion whether the Secretary, even if he had the statutory authority to postpone construction of the Garrison project, could constitutionally have bound his successors by contract to continue to delay the project. We also need not decide the extent to which the Impoundment Control Act of 1974, 31 U.S.C. § 1403 (1976), may have limited the Secretary's power to enter into the stipulation in 1977, an issue not briefed by any of the parties
 
 
 [20]
 Compare the language used by Congress in the Flood Control Act of 1962, Pub.L.No.87-874, Title II, 76 Stat. 1180: "The following works of improvement for the benefit of navigation and the control of destructive floodwaters and other purposes are hereby adopted and authorized to be prosecuted * * *. * * * (T)he projects authorized herein shall be initiated as expeditiously and prosecuted as vigorously as may be consistent with budgetary requirements(.)"
 
 
 [21]
 We are not persuaded by Audubon's contention that, even apart from NEPA, the Secretary had authority to suspend activities on the Garrison project. Neither of the statutory provisions cited by Audubon provides support for this proposition. 43 U.S.C. § 373 (1976) is an extremely general provision giving the Secretary authority to implement certain statutes; 43 U.S.C. § 1457 (1976) lists a number of agencies and subjects, including the Bureau of Reclamation, falling within the Secretary's responsibilities
 
 
 [22]
 NEPA instructs that "to the fullest extent possible * * * the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter." 42 U.S.C. § 4332(1) (1976)
 
 
 [23]
 Even if NEPA gives the government discretionary power to postpone implementation, we do not imply that it imposes a mandatory duty to do so. Unlike the Second Circuit's decision reversed by the Supreme Court in Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227-228, 100 S.Ct. 497, 499-500, 62 L.Ed.2d 433 (1980), cited by the state appellants, our decision in this case does not "interject itself within the area of discretion of the executive as to the choice of the action to be taken." Indeed, it gives deference to the Executive's discretion and substantially accords with the position taken by the government. See brief for federal appellants at 24-25:
 (I)f after completion of an environmental analysis the agency head believes that alteration or deauthorization of the project is warranted, NEPA gives the agency head discretion to defer project implementation pending his formulation of alternative legislation, its submittal to Congress, and a reasonable time within which Congress may act upon that legislation should it choose to do so. * * *
 (Footnote omitted.)
 
 
 [24]
 The state appellants contend that NEPA may not be used to justify the stipulation because the Secretary allegedly did not rely on NEPA. But the record clearly demonstrates that the stipulation was executed in order to permit the Secretary to reassess the Garrison project on environmental as well as economic grounds. Furthermore, the Stipulation and Order provides that the Secretary shall prepare a comprehensive supplementary environmental statement "in compliance with NEPA." Paragraph C
 
 
 [25]
 Cf. Local Div. 589, Amalg. Transit Union v. Commonwealth of Massachusetts, 666 F.2d 618, 637-638 (1st Cir. 1981). Although "if taken literally, the language of the Agreement would make it perpetual," the court stated, "(i)t is difficult to believe that the parties to the agreement thought they could bind their successors forever." Adding that "(t)he parties were presumably aware that a perpetual agreement was unlikely to be enforceable at law," the court favored an interpretation that would limit the contract's duration to "a reasonable time" after an event mentioned in the agreement. Id. at 638
 
 
 [26]
 Audubon seems to argue that, because the Administration has not submitted legislation, Congress could not have had a reasonable opportunity to deal with the issues surrounding the Garrison project. Brief for appellee at 31. This position ignores Congress' ability to generate and consider legislation, based on information before it, without waiting for an Executive initiative
 
 
 [27]
 See note 6 supra (unsuccessful congressional attempt to pass legislation overriding stipulation). These events reemphasize the fact that Congress is fully aware of the Garrison controversy; they do not indicate that Congress wishes the project to be postponed indefinitely
 
 
 [28]
 Under the analysis of this opinion, the government is no longer bound because of an implied term in the stipulation itself. The same result might also be reached even if the stipulation were interpreted to bind the government indefinitely. Stipulations entered into by parties in the course of legal proceedings "are not as irrevocable as other contracts." Brast v. Winding Gulf Colliery Co., 94 F.2d 179, 181 (4th Cir. 1938); Dalton v. Bowers, 53 F.2d 373, 374 (2d Cir. 1931); Hester v. New Amsterdam Casualty Co., 268 F.Supp. 623 (D.S.C.1967). Trial courts may, in the exercise of sound judicial discretion and in furtherance of justice, relieve parties from stipulations into which they have entered. Brast, supra, 94 F.2d at 181. Relief should be granted if the balance of equities favors the moving party. See Laughlin v. Berens, 118 F.2d 193, 196 (D.C.Cir.1940)